The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit Our fourth case of the day is number 19-1202, Capital Finance v. Rosenberg. Mr. Daugherty? Yes, Your Honor. Good to have you with us, sir. Thank you for allowing us to appear by phone, Your Honor. Yes, sir. You may proceed. Thank you, Your Honor. May it please the Court, my name is Colin Daugherty and I'm one of the attorneys who represents appellants Joseph Newman and Oscar Rosenberg in this matter. Mr. Newman and Mr. Rosenberg are two personal guarantors of a loan that were issued by Accoli Capital Finance to a number of business entities referred to in the briefing as the borrower. It was a collection of eight nursing facilities that received funds among other places from Medicare. At a bench trial that occurred over two days in front of Judge Bennett of the District of Maryland, rulings were issued by the court that rewrote the personal guarantees that were executed by Mr. Newman and Mr. Rosenberg to change a key and critical element, the word and, and read it as the word or, instead of in the normal customary and usual conjunctive form of and. This critical change then allowed the court to find liability on behalf of the personal guarantees against Mr. Rosenberg and Mr. Newman and created liability that now exceeds $1.3 million against these two guarantors. There is no reason and no explanation, no valid explanation for changing this unambiguous term in the contract and it goes against longstanding Maryland contractual interpretation to do so. Notwithstanding that capital. Mr. Dougherty, excuse me, this is Judge Diaz. I think you appropriately conceded that this issue with respect to how to interpret the conjunctive and is not absolute, that there are exceptions to the conditional meaning of what that conjunctive means in the normal course of conversation. And from the District Court's perspective, it observed that your clients were in essence arguing that they were free to commit fraud or other illegal actions with no liability on their personal guarantee and couldn't countenance reading that language to allow for that really incongruous and frankly, from this perspective, absurd and unrealistic result. So, I mean, that seems to make sense. But what is your response to that? Well, Your Honor, with all due respect to the trial court, we disagree. These were limited personal guarantees. And you're right. They were limited, but they weren't intended to be toothless. I understand, Your Honor, and I agree with that. What they did was create a situation that does not allow the guarantors to commit, openly commit fraud. It allows the guarantor, it allows capital finance to seek monies from the personal guarantors if those three issues happen, which are possible to happen together at the same time. Otherwise, the limited, the capital finance would be limited to the borrower, who is the signature of the loan. This comports with sort of traditional notions of the corporate entity. It also, unlike the cases relied upon by the court, with all due respect, we disagree that it creates an absurd result. What it does is create a situation where, through bankruptcy filings, and then in addition to a potential fraud or illegal act, the lender would not have another recourse because of the bankruptcy of the borrower or the borrower sub-entities, and would then have to seek recourse from the personal guarantors. Now you did provide an example, I guess, of the possibility of a party both colluding with other creditors to cause an involuntary bankruptcy and at the same time filing a voluntary bankruptcy. But you literally have to tie yourself up into a pretzel to make that happen. It just seems illogical to me that those two things would happen in the normal course of affairs, and even more illogical to think that someone who is attempting to minimize, to maximize its ability to recoup on a guarantee would intentionally agree to that kind of a provision, which effectively makes the guarantees meaningless. Well, I'm sorry, Ron, would you like me to respond? Yes. Well, so I think, though, consider, though, the borrower as a single entity creates a more difficult situation, a less likely situation for these multiple things to happen. But when you consider the borrower, what it really was was eight different entities, it increases the likelihood that the various issues could occur. Additionally, the parties agreed to this writing, including a sophisticated banking entity, and never admitted on the record that this prior to this court hearing, this issue was never discussed. You're talking about the trial when you say court hearing? I apologize. Yes, Your Honor. Right. So to say that the capital finance intended something different than what is written on the paper assumes that, quite frankly, a sophisticated banking entity made a mistake, and they've never argued that, nor offered evidence to that effect. In fact, throughout the trial and the briefing in this manner, the appeal, they have taken the position that the contract is unambiguous, and in fact, the trial court found the same. And we certainly struggle with the idea that using and in the disjunctive in this one spot in the contract, when it is always considered in the conjunctive throughout the entire contract otherwise, and or is used in the disjunctive throughout the contract otherwise, could be anything but unambiguous. Or if it is unambiguous, as the capital finance concedes, then it is unambiguously used in the conjunctive and means exactly what it usually and historically, customarily would mean, and that is all three events need to occur, which are possible to occur. This is Judge Wynn. So we are under Maryland law, and the Maryland Court of Appeals has recognized that those terms in and are can be used interchangeably when it is reasonable and logical to do so. And here you have an instance of either three events, improper voluntary bankruptcy, improper involuntary bankruptcy, and fraud or illegal behavior. Can you tell me one case where you've seen all three of those occur? Your Honor, I am not aware of any one case where that or any instance that you realize from your practice where all three of them have occurred. I'm only aware of the Caesars case that we cite where the first two occurred, but I certainly am not. That wouldn't do it under your scenario. You need all three. You need an improper voluntary bankruptcy, an improper involuntary bankruptcy, and fraud or illegal behavior. What in the world makes it logical that those three have ever occurred or the likelihood that it would occur? Your Honor, we will certainly concede as we did a trial that it is unlikely. How about illogical? Your Honor, I can't speak to what was in the mind of the draft. What was in your mind on it though? Don't you think that's illogical? Your Honor, I'm not a sophisticated banking entity. What kind of sophisticated folks here? We have to determine what's reasonable and logical. I'm just, I mean, it's just, I'm trying to follow the logic of the argument in light of Judge Diaz's question followed by Judge King. And when we look at those three things occurring, it just, I mean, I don't know how one can say you got to have all three because no one, not even you, can tell me the instance where all three, and I ask not only for cases but in your experience, where all three have occurred. I understand, Your Honor, but it is a limited personal guarantee. The purpose of a personal guarantee is... It sounds like there's no guarantee. If you've never seen it happen before, then it's, you know, it's nothing. Don't you think? For the trial court, there was a trial at the court, Judge Bennett found against you as a matter of fact, didn't he? Your Honor, the standard view or interpretation of a contract would be a de novo before... He heard evidence and then made findings and conclusions, and they're all adverse to you. Why wouldn't it be reviewed for clear error? Well, any factual findings would be reviewed for clear error, but any legal conclusions would be reviewed de novo. I know. I understand those legal principles, and I'm saying this is a factual finding, isn't it? That there was an error, well, we, quite frankly, we take exception with Judge Bennett's ruling because we can't... We can't get it to square in that he found that there was, that it should be read disjunctively, but that the contract was also unambiguous. Which is also what capital finance has argued, and our point being that... And did this end in that clause there, clause your people not to pay the taxes? It did not. And put the money in the wrong accounts? Your Honor, it was the third party payer who directed the money to go to the other accounts. But, and then the tax, as we pointed out in our brief, the tax money were due before a penalty would incur, and we were inside that time frame before the penalty accrued, even though I acknowledge that the taxes were not paid when specifically due. They were withholding taxes from employees, right? Yes, they were... They're trust monies. I mean, they stole the taxes from the employees instead of paying them over to the government. Well, with all due respect, Your Honor, we would take exception with the use of the term stole, but they had not... I'm sure you would, but I used to be a prosecutor. I've had cases, a lot of cases like this. I mean, a lot of cases of people messing with these withholding taxes. We used to have crusades to go after them. And the impetus of what Judge King is saying here in terms of the factual finding is you do have a different opinion in terms of how to look at this. But the question before us is whether there is clear and convincing evidence to support those findings that the trial judge made. And here, the question, you know, whether or not they intentionally provided false information about the tax obligations, and whether capital finance reasonably relied on that information, and whether there's evidence to support the district court's conclusion that there was a wrongful diversion of those payments to Medicaid funds. So you may be offering a reasonable interpretation otherwise, but that doesn't negate the trial court's finding if it is supported by clear and convincing evidence. It doesn't have to be absolute. It just has to meet that standard. I agree, Your Honor, and we certainly don't believe, and we believe the court erred in finding that there was clear and convincing evidence that the bank, that capital finance reliance was reasonable. We know that approximately six months prior to the loan of the million dollars at issue here, that the first default under the CSA was issued. Mr. Stein testified that he had nearly daily conversation with, Your Honor, may I continue? Yes, sir, you go ahead. Answer, finish your answer. You don't have to stop mid-comma with me. Okay, thank you, Your Honor. Mr. Stein, on behalf of the bank, testified that he had nearly daily conversations with Mr. Newman about the financial health and well-being of the borrower. He was aware that two of the eight entities had to be scuttled. He was aware of the financial distress. They had, capital finance had switched to paying only discretionary payments, and notwithstanding all of those facts, capital finance has argued, and we don't, certainly our position is that doesn't rise to clear and convincing evidence that their reliance was justifiable simply because their argument is you should ignore all of those facts and the fact that they engaged an auditor with their contractual rights and that they were actively participating with that auditor and that the auditor was reviewing the financial health of the borrower and simply because the borrower filled out a boilerplate pre-printed form that that is justifiable reliance to issue an additional million dollars to the borrowing entities that they were fully aware of were in financial distress. You know, capital finance has argued that its court should take, when finding intent, should take into consideration the sophistication of Mr. Newman but then ignores the sophistication of their own banking entity and professional lending entity in its conduct and to claim that it justifiably relied. Can I ask a follow-up on that, Mr. Dougherty? So you make, that's not an unreasonable argument, but of course, what capital finance was doing here with respect to this particular loan agreement was it was making advances against accounts receivables that had already been earned at the time of each advance. So the fact that your clients were having some financial difficulties in the present environment, while not completely irrelevant, I don't think, I think a reasonable fact finder could find that notwithstanding that, having received this certificate that suggested that all of the payroll taxes had been paid and therefore there was no concern about the government priming capital finance's otherwise first-in-line lien, that that made it reasonable, entirely reasonable for capital finance to provide the advance, particularly since it was doing so in reliance on the fact of accounts receivables that had already been earned. Why is that not a reasonable view that the district court could take? Well, your honor, to ignore the knowledge that capital finance has precludes capital finance from getting to its clear and convincing let burden of proof. Well, so I don't know that the district court ignored that evidence. I think the district court may have accounted for that evidence and found that notwithstanding these problems that were looming on the horizon and perhaps were present with respect to the overall financial health of these nursing home facilities, that the fact remained that there were accounts receivables that had been earned and booked and that that was the sort of the linchpin and the accompanying certificate that suggested that there were no problems with the payment of taxes, in particular payroll taxes, that that made it reasonable to continue to advance funds, notwithstanding all the points that you have raised about the difficulties that the entities were facing at the time. That's more of a statement than a question, but if you can respond if you'd like. Thank you, your honor. Again, our position and our belief is that was not a reasonable conclusion given their own sophistication as the lending facility and all of the financial issues that they were both observing and then the conduct they based upon those observations, including bringing an auditor into the fold who they were actively participating and interacting with capital finance being there. And that the auditor was issuing formal findings shortly after the money was sent to simply take a preprinted form is not reasonable reliance. Very good, sir. Appreciate it. We've given you plenty of extra time and you have some time reserved. Let's hear from Mr. Dorsey. May it please the court. This is William Dorsey for the Apelli Capital Finance LLC. I think it's already been discussed pretty extensively in this case. We believe that Judge Bennett correctly interpreted the guarantee and appropriately ruled in favor of the plaintiff on not just the breach of guarantee claim, but also the fraud conversion and punitive damages issues. I'll turn first to the guarantee and the triggers. I would just add briefly that the bankers and shippers case found that it was the clear and unambiguous meaning of the contract that the and should be read disjunctively in order to, quote, effectuate the intent of the parties. We do believe that it's unambiguous that this should be read in the disjunctive and that's exactly what the bankers and shippers case has held. It's exactly what was held in the fidelity and deposit case. We believe it's the only proper interpretation here. To the point that was raised earlier by, I believe it was Judge King, there was a reference to the findings of the district court and he specifically found that Mr. Stein, who is the banker at Capital Finance responsible for this loan, that he had explained that this type of provision, the trigger for the guarantee with the three triggering events, was widely used and designed to incentivize the principles of the borrowers to act in accordance with the credit agreement and that in his experience it would be highly unusual for the three conditions to occur at once. I think he was being perhaps, you know, understating it and then he said accordingly Stein understood the provision to require the occurrence of only one of the three conditions precedent listed and then it goes on to say that this court specifically finds that Mr. Stein was a credible and honest witness. So to the extent that there is any potential ambiguity in the contract and we don't believe there is, certainly the court has made factual findings that would support the conclusion that that's what the parties intended through this provision. Turning now, unless the court has any questions on that issue, to the conversion claim, I wanted to just be clear here because I think that the record is a little, you know, sparse in what was raised by counsel here about the circumstances. Capital Finance had a lien on all accounts of the borrower in this instance and accounts means money paid and money owed to the borrower including any bank accounts held by the borrower and in this agreement there was a requirement that all funds be deposited into what's known as a blocked account. The blocked account allowed Capital Finance to have a security interest over those funds through a deposit account control agreement and allowed them to, in the event of a default, sweep those funds. It is, I believe, uncontested that monies collected from intergovernmental transfers and Medicare payments were deposited into a different account that was not held through the DACAs and was prohibited under the terms of the loan agreements. And so therefore, the suggestion that those funds were not converted is unsupportable. Once the funds got there, there was still an obligation for those funds to be returned even if they were deposited by a third party. Demand was made for those returns and this is what's sort of not been addressed to the court yet. There were demands and this was raised at the trial court in the testimony and in the documents. There were demands made once Breslin and Young had started looking at these issues to return all of the converted funds and Mr. Newman actually returned some of them but not all of them in response to those demands. Never once did he suggest that these were not the accounts of the borrower or the collateral of capital finance. So for them now to suggest that there's... Can I add? Yes. So there was a demand for return of the funds but, I mean, it literally was not a demand for the return of the specific cash bills or money that were deposited in the account.  not any particular pot of money. I'm having trouble understanding. Ultimately, the right here was a right to payment, not any specific suitcase or stash of funds. That's the issue I have with respect to this conversion claim. But frankly, I don't know if that matters in the context of this case because even if you're wrong on that, I don't think it changes the result. But go ahead. Somebody's on mute. So conversion is available when there's a specifically identified group of funds and Breslin and Young specifically identified the funds that had been diverted from intergovernmental transfers in Medicare. And I don't have the demand in front of me, but I believe that the demand specifically identified the funds that had been deposited into the wrong accounts and demanded that those funds be returned so that those amounts could be applied to the loan balance. So when you're talking about... Let me just ask you a practical question. So if they had, in fact, just simply gone to a different account, a personal account, and deposited those monies into the account, are you saying that they wouldn't have complied with the requirement to return the funds because they didn't return the precise cash bills or the monies that had been taken out initially? Well, would there have been... If new money had been put in to replace the money that was specifically identified, I agree we probably wouldn't have been bringing a conversion action, but I think that it satisfies the elements of the claim that there was a demand made for the specified amounts because they were identifiable, and that's exactly what Mr. Young did in going through all the account records and identifying the improperly deposited money. For instance, if a non-IGT or Medicare payment totally unrelated to the borrowers had mistakenly been deposited into the Chase account, that wouldn't be conversion. We wouldn't have a claim for those funds. This is money that are defined as accounts. They're identifiable, and they were put into the wrong account, and they refused to put them into the right one. In fact, hundreds of thousands of dollars disappeared from that account. Isn't there some evidence in the record that some of these funds were commingled once they were deposited into the Chase account? There was record that these funds were deposited with other money into the Chase account. We did not trace all the way to the end of the line whether there were additional funds that were converted and whether these were, but these were all accounts of the borrowers, and we did not make a claim for the funds other than for what was deposited from Medicare and IGT into those accounts, so we've limited the claim. My point is, isn't that sort of weakening the claim that there's a commingling of funds, that there really wasn't the kind of segregation that would be necessary to make that a claim of conversion? I understand the law to be that it does not eliminate a claim for conversion for the funds to be deposited into another account as long as they're identifiable, and we have bank statements confirming which funds were deposited into the account and demanded the return of those funds. Okay. Turning briefly to the issue of reasonable reliance, again, I want to be careful about, you know, how these facts have been characterized. Our client was aware of financial difficulties of a borrower, and in response to that and subsequent meetings with the borrower took action including the hiring of an expert who was tasked with going through the accounts of the borrower to find out what was going on, and it was only after that report was issued and it confirmed the intergovernmental transfer and the Medicare diversion as well as the failure to pay payroll taxes that a subsequent default notice was issued and the actions that were taken here were done. I don't think it's a reasonable conclusion, much less one that's, you know, something that could, you know, upsetting of the trial court's determination to suggest that a bank has an obligation or is on notice that a borrower is failing to pay payroll taxes or is stealing money just because it's in financial distress. The time period between when the report was issued by Breslin and Young and the default notice issue and action was taken is, I think, a matter of days, and that is a perfectly reasonable response, and it's clear that the bank reasonably relied on the statements and that's exactly what the court found. So we believe that that finding as well as the finding of intent is fully justified. There wasn't much talk of the evidence of intent here, but the suggestion that the court aired by concluding that Mr. Newman acted with intent in submitting false borrowing-based certificates is, you know, unsupportable. Mr. Newman had years of industry experience. He was the one solely responsible for the operations of the business and solely responsible for the accounts that were controlled by the borrower and knew he had to make representations about the borrower's financial health to capital finance in order to obtain advances under the loan. He also signed the same form borrowing-based certificate every time advances were requested, which was tens and tens of times in this instance, and so to suggest that he didn't bother to read what he was representing or didn't know that it was false when everybody now knows it was false is, you know, it certainly is not clearly erroneous to reach that conclusion, and we don't think it's an appropriate inference to draw from the facts, even if it weren't under the standard. So, you know, we would ask that the court affirm the finding of the trial court in total and, you know, deny the appeal. Happy to answer any questions that you may have, though, going forward. Thank you very much, sir. Mr. Daugherty? Thank you, Your Honor. Regarding the court's questions about the conversion claim, we certainly agree that it is the exception that money can be converted, and in this factual scenario, it would be improper to convert it, that the court's questions were exactly correct. This was a demand for reimbursement, and quite frankly, the capital finances position is that once they held the lien on the collateral, that once it was paid into any account of the borrower, then they already had that lien established, and it simply was a demand for reimbursement in addition to the concerns about commingling of funds and it not being a specific suitcase full of specific bills. So we certainly agree that that, in and of itself, either of those issues would doom the conversion claim, and it should be reversed regarding that. To address counsel's point about bankers and the bankers and shippers case, which the court also relied on, that was an insurance contract. The parties specifically agreed and intended to provide insurance and seek insurance. This case is different in that the guarantee that issued here were specifically agreed and intended to be limited. There is a dispute, obviously, between the parties on how limited. So the unambiguous reading of the end throughout the contract is in the conjunctive and should continue to be in the conjunctive here, which isn't opposed to the bankers and shippers case. It actually comports with the bankers and shippers case because in that case, there would be no insurance, which was the specific intent of the parties to create an insurance contract. In addition, if two pilots were required to fly the plane, as the court found, it would likely result in catastrophic disaster. So that's why the bankers and shippers case does not preclude the result we are advocating for because while it is possible for these three events to occur, albeit unlikely, but more specifically, the intent of the parties was for this to be a limited guarantee. And Mr. Stein, the evidence offered is years later. There is no evidence that this was ever discussed, that this cause was ever discussed, and how limited the limited guarantee should have been. We only have, as offered by Capital Finance at trial, which their burden was that Mr. Stein now, years later, in a post hoc explanation was that no, they intended it to be each individual position. And then regarding, you know, counsel commented about how to infer intent based upon, again, Mr. Newman's sophistication. Certainly our position is Capital Finance is taking a sort of cake and eat it too type of argument of you should take into consideration Mr. Newman's sophistication, but ignore the bank's sophistication and ignore the bank's conduct to date and find justifiable reliance and support to support the claim of fraud. Therefore, you know, it was our position that the torts should be both dismissed and judges should be reversed on the entire case, but specifically, certainly the torts, which would also then preclude a finding of punitive damages. And I believe I have about 20 seconds left. If the court has any additional questions. Hearing none. Mr. Daugherty, I want to thank you for your arguments. Well, those of the opposing counsel will take this case under advisement. And Madam Clerk, I believe we can adjourn not just for the day, but sign it. Aye. Yes, sir. It's on our court stands adjourned.
judges: Robert B. King, James A. Wynn Jr., Albert Diaz